UNITED STATES of America,
Plaintiff–Appellee,

v.

Joseph R. REDMON, Defendant–
Appellant.

No. 96–3361.

United States Court of Appeals,
Seventh Circuit.

Argued Feb. 27, 1997.

Reargued En Banc Nov. 25, 1997.

Decided March 10, 1998.

Richard N. Cox, Office of the United States Attorney, Urbana, IL, Rodger A. Heaton (argued), Office of the United States

Attorney, Springfield, IL, for Plaintiff–Appellee.

Kevin M. Schad (argued), Cincinnati, OH, for Defendant–Appellant.

Before POSNER, Chief Judge, and CUMMINGS, BAUER, WOOD, Jr., COFFEY, FLAUM, EASTERBROOK, RIPPLE, MANION, KANNE, ROVNER, DIANE P. WOOD, and EVANS, Circuit Judges.

HARLINGTON WOOD, Jr., Circuit Judge.

While most people have a good idea what "garbage" is, many people do not realize that garbage can cause some serious constitutional issues. This is such a case.

The defendant, Joseph R. Redmon, was indicted in April 1996, charged with the possession of over 400 grams of cocaine, with intent to distribute in violation of 21 U.S.C. § 841(a)(1). After the district court denied his pretrial motion to suppress evidence, Redmon entered a conditional plea of guilty reserving the right to appeal the denial of his motion. In September 1996 the district court sentenced Redmon as a career offender, and this appeal followed.[1] Redmon raises two issues: first, whether the warrantless searches of his garbage cans violated his Fourth Amendment right of protection from "unreasonable searches," and secondly, a sentencing issue. The facts follow in more detail as they are critical to the consideration of the search warrant constitutionality problem.

*Factual Considerations*

In early 1993 a joint federal and local drug enforcement task force in Urbana, Illinois began tracing a shipment of about a pound of cocaine sent from California to a fictitious address in Urbana, Illinois. From an informant the task force determined a man named Shaw was expecting such a package. An undercover agent delivered the package to Shaw who, when interrogated, claimed he had received it, not for himself but for another person who used the alias "Blackbelt." Blackbelt was later identified as defendant Joseph Redmon, residing at 1319 Harding Drive in Urbana.

Redmon's Harding Drive address was found to be the eastern-most unit of an eight-unit townhouse, all units sharing a common wall. The structure is located on the southwest corner of the intersection of Vawter Street and Harding Drive. Redmon's townhouse and its entrance actually face east on Vawter Street, although his one-car connected garage faces north on Harding Drive. His garage is also connected to his neighbor's garage. The two neighbors share a common driveway which extends north from their connecting garages about twenty-four feet to a four-foot wide public sidewalk and then slightly less than an additional ten feet to Harding Drive. The common driveway is about twenty-five feet wide.[2, 3]

Access to the townhouses of Redmon and his neighbor could be gained only by first proceeding up their common driveway towards the front of the connected garages. Then from the corner of his side of the garage, Redmon's sidewalk leads to the left around the corner of the garage to his front door. Access to his adjacent neighbor's townhouse is also gained by proceeding up the common driveway towards the garages and then proceeding to the right on a sidewalk around the opposite corner of the garage to the neighbor's front door which faces Harding Drive.

The constitutional garbage issue arises as a result of police surveillance of Redmon's townhouse based on their narcotic suspicions. During the surveillance, Redmon was observed carrying his garbage cans out of his garage and placing them on the driveway between the garage doors for collection on

---

1. Redmon was sentenced to 188 months of imprisonment, six years of supervised release following his imprisonment, and a $50 special assessment.

2. Government Exhibit #3, a photo reproduced in the addendum, shows the view of the east side and entrance to Redmon's townhouse as seen from Vawter Street. The windowless wall to the right of the entrance is the side of Redmon's part of the garage. Some of the driveway can be seen.

3. Government Exhibit #1, included in the addendum, illustrates the layout of Redmon's and his attached neighbor's townhouses. Redmon's side is indicated on the plat as "1319" and his neighbor's as "1317."

collection days. Then after the garbage had been collected Redmon would carry his empty garbage cans back inside his garage. At times Redmon also placed plastic trash bags outside for collection in addition to his garbage cans. The cans were customarily placed for collection between Redmon's garage door and his neighbor's.[4] A city ordinance at that time prohibited garbage from being put curbside for collection.

The police acted on their suspicions on January 4, 1996, January 22, 1996, and March 14, 1996, when without search warrants they removed the contents of Redmon's garbage cans while the cans were sitting just outside his garage on the common driveway awaiting collection. The garbage can searches not only confirmed the fact that Redmon resided at that address, but also confirmed police suspicions by revealing evidence of drug dealing. The garbage contained clear plastic bags shown to be commonly used in packing and shipping cocaine. The bags field-tested positive for cocaine. A glass vial test tube wrapped in a Spanish language newspaper was also found. It likewise tested positive for cocaine. Rubber and tape packages were found, commonly used in packaging shipments of cocaine. Those packages also tested positive for cocaine. Based on this garbage can evidence a search warrant for Redmon's residence was issued in March 1996 by the district judge. That residence search, as anticipated by the police, produced the packages of cocaine charged in the indictment.

### Search Issue

Redmon objects to the search of his house accomplished with a warrant which was issued based on evidence uncovered during the warrantless garbage can searches. First, it is claimed that the garbage cans were located within the curtilage of Redmon's residence.[5] Secondly, Redmon argues that the containers and their contents had not been "aban-

doned." Thirdly, it is claimed that Redmon had a "reasonable expectation of privacy in the contents of his garbage cans." The warrantless searches of the garbage cans, Redmon argues, were therefore in violation of the Fourth Amendment. Redmon sought to quash the residential search warrant obtained on the basis of the garbage can evidence and to suppress the resulting evidence. Redmon's motion was denied by the district judge.

### Discussion of the Searches

As we approach this search problem we shall not endeavor to fashion some convenient rule to fit all situations. That might be useful in some difficult cases for the police and others, including drug dealers, but many situations, as is this one, can reasonably be expected to be primarily fact-based not lending themselves to bright line rules. We do not mean to imply that the decision in this case upholding the garbage can searches means that anybody's garbage cans placed on the driveway adjacent to his or her garage, regardless of the other facts and circumstances, can henceforth be searched without a warrant. Each case of this nature will involve the weighing of all the relevant factors and the exercise of a fair judgment with due regard for the important constitutional guarantees as defined by Supreme Court and other conforming precedents. Nor does the affirmance of this conviction mean that this court is issuing a pass to the police to violate the Fourth Amendment. The police, whenever they have sufficient grounds and a warrant would be required, absent urgent circumstances, must seek search warrants to properly serve their own and the public purposes. Nor are we suggesting on the other hand that every police peek into a suspicious garbage can, regardless of the surrounding circumstances, requires a warrant. Nor do all those who want to keep their garbage

---

4. Government Exhibit # 2, reproduced in the addendum, is a view of the connected garages of Redmon and his neighbor and the shared driveway. Redmon's walk to his front door extends to the left around the corner of the garage and his neighbor's walk to his front door extends to the right around the garage to the neighbor's front door. Government Exhibit # 5 shows the garbage cans placed in front of the garage on collection day for pickup.

5. At one point Redmon's counsel objected to characterizing the garbage cans as garbage cans instead of as some variety of all-purpose plastic containers. That argument appears to have been abandoned, likely because the particular cans looked like garbage cans and smelled like garbage cans and not like some all-purpose containers. This distinction was noted in our case of *United States v. Hedrick*, 922 F.2d 396, 399 (7th Cir.1991).

secret need, because of this decision, resort to storing it under their beds. Nor do the important drug war efforts justify the commission of constitutional violations by the police. However, after considering all the factual circumstances of this case, these police searches, in our judgment, do not violate the constitution.

This case would be over if there was a Supreme Court case "on all fours," but there is none, nor are there any duplicates in any other circuit which we have been able to find. There are numerous other garbage cases, some similar and some not so similar. Many of those cases would require an unproductive effort to sort out or distinguish the various factual circumstances regardless of the holdings of the cases. There are, however, some applicable guiding principles found in the cases.

■ Many of the cases mention "curtilage" as a factor, that is an imaginary boundary line between privacy and accessibility to the public. Sometimes that line may be easy to locate as where, for instance, a fence or wall around the home keeps out the public. Sometimes, however, the determination can be difficult. The district court did not use the term, but that is of no consequence if the right criteria are otherwise applied. "The mere intonation of curtilage, however, does not end the inquiry." *United States v. Hedrick*, 922 F.2d 396, 399 (7th Cir.1991). A curtilage line is not necessarily the property line. Nor can it be located merely by taking measurements from some other case or precedent and then by use of a tape measure trying to determine where the curtilage is in a different case.

Both parties cite our case, *United States v. Hedrick*, 922 F.2d 396 (7th Cir.1991), to support their positions. The defendant first directs us to wording in *Hedrick* which he sees as supporting his position. It seems at first to do so. The quote is as follows, "garbage cans located 20(sic) feet from the garage and approximately 50(sic) feet from the back door of the house were technically within the curtilage of the house, in which privacy expectations are most heightened." *Id.* at 399. That quote, however, must be considered in

the context of the whole case. *Hedrick*, based on other considerations besides mere measurements, held the search valid. Defendant's argument reveals the folly of trying to decide these cases merely by a tape measure comparison.

■ Redmon then argues with more substance that he had an objectively reasonable expectation of privacy in the garbage cans placed next to his attached garage, and that he was therefore protected from unreasonable searches and seizures of the incriminating evidence. That is the issue. This reasonableness determination can best be begun by considering additional language found in *Hedrick*. Then the zone of privacy or curtilage may be determined after considering all the factors, and not just the feet and inches.

In *Hedrick*, the court looked to *California v. Greenwood*, 486 U.S. 35, 108 S.Ct. 1625, 100 L.Ed.2d 30 (1988), for guidance. In *Greenwood*, the police also had their illegal drug suspicions as in the present case. A surveillance of Greenwood's home was conducted. A cooperative trash collector picked up the plastic garbage bags in front of Greenwood's house and turned the bags over to the police. A search of the bags revealed items indicative of narcotics use. That information was used by the police to secure a warrant to search Greenwood's home. The search produced cocaine and hashish leading to the arrest of Greenwood.[6] Greenwood was admitted to bail but soon he followed the same garbage routine and so did the police. Consequently, Greenwood was arrested a second time.

The seizure of Greenwood's garbage bags left at the curb, the Court held, would be a Fourth Amendment violation "only if respondents manifested a subjective expectation of privacy in their garbage that society accepts as objectively reasonable." *Greenwood*, 486 U.S. at 39, 108 S.Ct. at 1628. Greenwood did not disagree with that standard, but he asserted that he did have an expectation of privacy in his trash. His trash, he explained, was only temporarily at the street waiting to be picked up, then to be mixed with other

---

6. There is another respondent in *Greenwood*, who is not specifically included in this synopsis

as his presence makes no difference for these purposes.

trash and finally to be deposited at the garbage dump with little likelihood it would be inspected by anyone. The Court accepted the personal privacy expectation of Greenwood under those circumstances, as well as Greenwood's belief that his trash would not become known to the police or public. The Court, however, imposed an important condition on that privacy expectation if Fourth Amendment protection was to be justified. That constitutional protection does not arise, the Court explains, "unless society is prepared to accept that expectation as objectively reasonable." *Id.* at 39–40, 108 S.Ct. at 1628. The Court concluded that Greenwood exposed his garbage to the public sufficiently to defeat his Fourth Amendment claim. The Court in support of its conclusion notes that curbside trash is readily accessible to animals, children, scavengers, snoops, and other members of the public. *Id.* at 40, 108 S.Ct. at 1628–29. Furthermore, the Court noted that the trash was put at the curb for "the express purpose of conveying it to a third party, the trash collector, who might himself have sorted through [Greenwood's] trash or permitted others, such as the police, to do so." *Id.* Expecting his trash to be picked up by strangers, it was held that Greenwood could have had no reasonable expectation of privacy in the incriminating evidence he discarded in his trash. *Id.* at 41, 108 S.Ct. at 1629. That trash was therefore not subject to Fourth Amendment protection. We reach the same conclusion in the present case even though it is not strictly a curbside collection.

In the present case, Redmon, because of a local ordinance at the time, could not put his trash at curbside. He therefore had little choice except to keep the cans somewhere on his own property to be available when collection was scheduled. Redmon, in effect, chose the front of the joint garage on the shared driveway-sidewalk to be his curb for garbage pickup purposes.

Before *Greenwood* we had come to a similar conclusion in *United States v. Kramer*, 711 F.2d 789 (7th Cir.), *cert. denied*, 464 U.S. 962, 104 S.Ct. 397, 78 L.Ed.2d 339 (1983), cited with approval in *Greenwood*. *Greenwood*, 486 U.S. at 42, 108 S.Ct. at 1629–30. In *Kramer*, this court went directly to the point in affirming the conviction and holding "that the special protection the Fourth

Amendment accords people in their 'persons, houses, papers and effects' does not extend to their discarded garbage." *Kramer*, 711 F.2d at 792 (citations omitted). That may fit the definition of garbage some use that, "Garbage is garbage." The district court found Kramer's garbage to have been "abandoned." *Id.* This court noted in *Kramer* that there are personal things some do not want other people to see. People sometimes, nevertheless, just throw those things in their trash. *Kramer* then mentions certain alternatives those people can follow to keep their secrets from being discovered in their garbage cans. *Id.* We see no need here, however, to further instruct drug dealers on how to avoid arrest by not making the mistake Redmon made in his case. It was Redmon's mistake, not the mistake of the police. His garbage cans were purposefully placed by him outside his garage for collection and could not be considered some sort of personal safety deposit boxes designed for his illegal purposes. Not all good police work is unconstitutional.

Another pertinent issue in *Kramer* arose because Kramer claimed the police had trespassed on his property to collect the bags from an area apparently inside his low perimeter fence. *Kramer*, 711 F.2d at 792. The court assumed for its purposes that the garbage was on defendant's property when it was collected. In *Kramer* a distinction is drawn, for example, from a situation in which the police break into a defendant's house without a warrant and take the contents of the wastebasket in the bedroom. *Id.* at 793. If that, or anything close to that, was the factual situation in our present case, that evidence, of course, would not be admissible against Redmon. He would be free to go home to 1319 Harding Drive to be more careful next time, but we might consider sanctions against the government for a frivolous appeal. Kramer's trash had been collected from just inside his knee-high chain fence along the street curb thirty feet from his house. It was held no privacy interests were infringed. *Id.* at 794. At first glance *Kramer* appears to be an easier case than the present case because Kramer's trash was near to the curb. Redmon's "curb" for practical collection purposes was necessarily not

at curbside, but on his joint walk-driveway. The paths to the front doors passing near the garbage cans without any obstruction were open to use by friends and guests of himself and his neighbors, as well as solicitors, strangers, postal people, and a myriad of others including animals, and even snoops mentioned by the Supreme Court in *Greenwood*. *Greenwood*, 486 U.S. at 40, 108 S.Ct. at 1628–29. Urban dogs and raccoons, though not specifically singled out by the Supreme Court, can be very ingenious in their intrusions of garbage cans. They can easily have their fun with the garbage, spreading it out on the driveway for all to see.

■ *Greenwood* concludes its garbage discussion by emphasizing that Fourth Amendment protection must "turn on such factors as 'our *societal* understanding that certain areas deserve the most scrupulous protection from government invasion.'" *Greenwood*, 486 U.S. at 43, 108 S.Ct. at 1630 (citation omitted). The Court's conclusion is that our society would not accept as reasonable a claim to an expectation of privacy in trash left for collection in an area accessible to the public. *Id.* at 41, 108 S.Ct. at 1629. After considering all the factual circumstances in the present case, that is likewise our conclusion.

In *Hedrick*, we elaborated on the *Greenwood* holding which, as we mentioned, had cited our *Kramer* case, 711 F.2d 789 (7th Cir.1983), with favor. As noted in *Hedrick*, the *Kramer* decision had been based both upon the theories of abandonment and exposure to the public. *Hedrick*, 922 F.2d at 398. The continued viability of the abandonment approach, we noted in *Hedrick*, was questionable. *Id.* But whether the abandonment approach still remains questionable is likewise questionable. Redmon injected the abandonment analysis in his argument in the district court by claiming that his garbage had "not been abandoned." At oral argument Redmon's counsel was asked whether or not Redmon's taking his garbage out of his garage and leaving it where it was to be picked up by the collectors evidenced "aban-

donment." Counsel's candid answer was to the effect that there was "some sort of abandonment," but he argued that abandonment was not the proper focus.

■ It appears, nevertheless, that Redmon's garbage was abandoned when he moved it out of his garage and placed it for collection. We see no reason that Redmon's abandonment intent should also be abandoned so that it cannot be considered along with other factors in making the Fourth Amendment determination. Counsel was asked where he would draw the curtilage line in the Redmon circumstances. He had some difficulty, as do we, with that concept when trying to be specific. The answer can best be found in *Greenwood*'s discussion which took note, among other factors, that the can had been placed so that it would be picked up by the collector, a third party stranger. *Greenwood*, 486 U.S. at 40, 108 S.Ct. at 1628–29. Redmon does not claim that the collector was a friend or family member. The Court, in *Greenwood*, notes that the garbage collector could have sorted through it himself, or permitted others including the police to do so. *Id.* The same situation is present here.

In *Hedrick*, we considered the accessibility and exposure of the discarded garbage to the public. *Hedrick*, 922 F.2d at 398. We also noted that the visibility of the yard to the public was a factor rendering the expectation of privacy unreasonable.[7] *Id.* at 399. It takes little more than a look at the plat, government exhibit #1, showing the Redmon location at the intersection of two city streets and the short common driveway-sidewalk arrangement with his neighbor to see how very publicly exposed and accessible Redmon left his garbage. Redmon, no doubt, did not intend to sacrifice the privacy of his garbage cans which would reveal illegal drug materials. Under the particular circumstances, however, his expectation was not reasonable, and not an expectation which we believe society is prepared to accept or should accept whether in downstate Illinois or elsewhere in this country. The district court came to the same conclusion.

---

7. *See also United States v. Shanks*, 97 F.3d 977, 980 (7th Cir.1996) (holding that the defendant in that case could not have an objectively reasonable expectation of privacy in incriminating evidence when the garbage was in containers readily accessible and visible from public thoroughfares).

Redmon also suggests that our case, *United States v. Pace*, 898 F.2d 1218 (7th Cir. 1990), is inconsistent with the conclusion reached in the present case. We fail to see the significance of *Pace* in Redmon's circumstances; at least *Pace* does not involve garbage. In *Pace*, police entered the garage of a suspect to detain the suspect whom they had cause to believe might be an assassin in a drug situation. The facts in *Pace* are interesting, but irrelevant in the Redmon conviction. We held in *Pace* that it was reasonable for police to enter the garage without a warrant even assuming the garage was part of the curtilage. *Id.* at 1228–29. In footnote 2, we explained the factors to be considered for a curtilage determination which include "the proximity of the area to the home itself, the nature of the uses to which the home is put, whether the area is within an enclosure surrounding the home, and the steps the resident has taken to protect the area from observation by passersby." *Pace*, 898 F.2d at 1229 n. 2 (citing *United States v. Dunn*, 480 U.S. 294, 301, 107 S.Ct. 1134, 1139, 94 L.Ed.2d 326). We believe our decision in *Redmon* passes all the tests.

*Sentencing Issues*

■ At the time of Redmon's present offense, March 19, 1996, he was twenty-nine years old. He had a 1989 Illinois felony conviction for possession of cocaine with intent to deliver and a 1986 Illinois aggravated battery conviction. In the Sentencing Commission Enabling Act, Congress directed the Sentencing Commission to specify a sentence of imprisonment "at or near the maximum term authorized" for an adult defendant convicted of a violent crime or felony drug offense who had two such prior convictions. 28 U.S.C. § 994(h). To implement that congressional requirement, the Sentencing Commission promulgated § 4B1.1 of the Guidelines, entitled "Career Offender," which provides in pertinent part this qualification for that enhancement:

A defendant is a career offender if (1) the defendant was at least eighteen years old at the time of the instant offense, (2) the instant offense of conviction is a felony that is either a crime of violence or a controlled substance offense, and (3) the defendant has at least two prior felony convictions of either a crime of violence or a controlled substance offense.

Amendment 506 to the Commentary to § 4B1.1 provides that "offense statutory maximum" means only "the maximum term of imprisonment authorized for the offense of conviction ... not including any increase in that maximum term under a sentencing enhancement provision that applies because of the defendant's prior criminal record." U.S.S.G. § 4B1.1, Amendment 506. However, in *United States v. Hernandez*, 79 F.3d 584 (7th Cir.1996), we held that Amendment 506 is inconsistent with § 994(h)'s unambiguous statutory direction and therefore is not entitled to deference.

Following *Hernandez*, the district court applied § 4B1.1 to Redmon without reference to Amendment 506. As applied including the enhancements, § 4B1.1 raised Redmon's base offense level to 34 from 32. Despite our precedent, Redmon contends that the district court erred in refusing to follow Amendment 506 in applying § 4B1.1 to him. In support of his argument, he relies on *United States v. LaBonte*, 70 F.3d 1396 (1st Cir.1995), *rev'd*, —— U.S. ——, 117 S.Ct. 1673, 137 L.Ed.2d 1001 (1997), in which the First Circuit upheld the validity of Amendment 506. At the time Redmon filed his appeal, the Supreme Court had granted certiorari in *LaBonte*. Thus, Redmon requested this court to hold its decision on his sentencing issue in abeyance, reasoning that if the Supreme Court affirmed *LaBonte*, it would be implicitly reversing *Hernandez*, and as such, he would be entitled to a new sentencing.

The Supreme Court recently issued its opinion in *LaBonte*, reversing the First Circuit and adopting a holding consistent with our opinion in *Hernandez*. Therefore, Redmon's appeal must fail, and his sentence is affirmed.

The sentencing issue as dealt with in the original panel opinion and set out above was not raised for en banc consideration by the court and therefore remains unchanged.

The district court is AFFIRMED in all respects.

# ADDENDUM

## Government Exhibit #1

CAₗ

**Government Exhibit #2**

View of Redmon's and his neighbor's connected garages and joint driveway-walkways. The garbage cans were placed between the garage doors for collection.

The exhibit also shows the public walk where it crosses the driveway and at the bottom of the photo can be seen a section of Harding Drive and the street curb.

**Government Exhibit #5**

View of Redmon's garbage cans out for collection. The walk to his front door goes around the corner of his garage to the left.

**Government Exhibit #3**

View of Redmon's house from Vawter Street.

COFFEY, Circuit Judge, concurring.

I join and concur in Judge Harlington Wood's well-reasoned analysis as set forth in the majority opinion. Redmon's garbage simply does not fall within the scope of protection that the Fourth Amendment accords persons, their houses, papers and effects. I write separately to briefly extend several remarks on an issue that appears to have engendered some debate among various members of this Court; namely, whether abandonment theory, that is, the concept of voluntarily and intentionally relinquishing one's property right in a discarded *res*, continues to thrive in our Fourth Amendment "garbage" jurisprudence. I think it does, and the majority as well as Judge Flaum

seem to agree with me, whereas Judge Rovner opines that the theory has "crept into the majority's analysis" (Rovner, J., concurring at 55), thus claiming that its day came to pass with the Supreme Court's decision in *California v. Greenwood*, 486 U.S. 35, 108 S.Ct. 1625, 100 L.Ed.2d 30 (1988).

Initially, I am forced to disagree with my esteemed dissenting colleague, for the *Greenwood* Court never expressly, nor impliedly for that matter, rejected the abandonment theory.[1] Try as one might, no one is able to point to a single passage in the *Greenwood* majority opinion that suggests otherwise. Instead, Judge Rovner grasps at the passing observations of *Greenwood*'s two dissenting Justices, who tell us that "[t]he Court prop-

---

1. I add that the panel in *United States v. Hedrick*, 922 F.2d 396 (7th Cir.1991), did not extol that abandonment theory is inapplicable in Fourth

Amendment cases, but only stated that its continued viability was "questionable."

erly rejects the State's attempt to distinguish trash searches from other searches on the theory that trash is abandoned and therefore not entitled to an expectation of privacy," *Id.* at 51, 108 S.Ct. at 1634 (Brennan, J., dissenting), and then go on to quote from another dissent for the proposition that "'property interest [in trash] does not settle the matter for Fourth Amendment purposes, for the reach of the Fourth Amendment is not determined by state property law.'" *Id.* (quoting *California v. Rooney,* 483 U.S. 307, 320, 107 S.Ct. 2852, 2859, 97 L.Ed.2d 258 (1987) (White, J., dissenting)). With all due respect, the majority in *Greenwood* spoke for itself, and I am quite certain that none of its number were interested in having the dissenters write on their behalf. The *Greenwood* dissent is indeed an exceedingly small hook upon which Fourth Amendment abandonment critics can hang their hats.

In my view, the theory of abandonment survived *Greenwood,* and is alive, well and flourishing in our Fourth Amendment jurisprudence. Simply stated, if it is the customary practice for an individual to deposit his garbage in a receptacle and leave it in a particular place for pick-up by public or private trash collectors, he has manifested an intent to abandon his refuse at such point in time that he leaves it unsecured in that place. *See, e.g., United States v. Shelby,* 573 F.2d 971, 973 (7th Cir.), *cert. denied,* 439 U.S. 841, 99 S.Ct. 132, 58 L.Ed.2d 139 (1978) ("In our view the placing of trash in the garbage cans at the time and place for anticipated collection by public employees for hauling to a public dump signifies abandonment."). Thus, the intent to relinquish ownership and abandon trash is tantamount to "throwing away" a subjective expectation of privacy in it that society accepts as objectively reasonable. In short, when it comes to abandoned property, "I know it when I see it," *Jacobellis v. Ohio,* 378 U.S. 184, 197, 84 S.Ct. 1676, 1683, 12 L.Ed.2d 793 (1964) (Stewart, J., concurring) (identifying what constitutes "obscene" material), and when the police see abandoned garbage which has been left unsecured in its usual place and at its usual time for collection, it is theirs for the taking.

FLAUM, Circuit Judge, joined by EASTERBROOK, Circuit Judge, concurring.

In the context of warrantless trash searches, the Supreme Court has instructed courts to base their assessments of reasonableness on the degree of public accessibility of the trash. *See California v. Greenwood,* 486 U.S. 35, 41, 108 S.Ct. 1625, 1629, 100 L.Ed.2d 30 (1988). The Court today concludes that Joseph Redmon had no reasonable expectation of privacy in garbage that he left at the point of collection where it was readily accessible to the public. I agree that this is the proper disposition of the present case. While I am sympathetic to the policy concerns raised by the dissenters, I cannot reach their ultimate conclusion because I do not believe that *Greenwood's* ready accessibility test contains an "outside the curtilage" limitation. Rather, location is merely one factor in evaluating the accessibility of garbage. Until the Supreme Court imposes a curtilage limitation on *Greenwood,* I do not believe that we can appropriately infer it.

### I.

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." The Supreme Court has interpreted this constitutional safeguard to bar searches and seizures by the Government that violate a person's "reasonable expectation of privacy." *See Katz v. United States,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). The Court has stated that "[w]hat a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection" and therefore cannot support a reasonable expectation of privacy. *Id.* at 351, 88 S.Ct. at 511. In the context of trash searches, a person is considered to have knowingly exposed any trash that is "readily accessible" to the public (and thereby to have forfeited any reasonable expectation of privacy in the trash). *Greenwood,* 486 U.S. at 40, 108 S.Ct. at 1628–29. The determination of ready accessibility is highly fact-bound, yet because it is essentially a reformulation of

the ultimate determination of reasonableness, it receives plenary review from an appellate court. *See Ornelas v. United States,* 517 U.S. 690, ——, 116 S.Ct. 1657, 1663, 134 L.Ed.2d 911 (1996).

A review of the applicable case law of this Circuit and the Supreme Court demonstrates that the search of Redmon's garbage was reasonable. The starting point is the Supreme Court's decision in *Greenwood,* 486 U.S. at 35, 108 S.Ct. at 1626. In that case, police searched garbage bags that Greenwood had left for collection on the street curb in front of his house.[1] A trash collector picked up the garbage and then turned it over to the police, who found evidence of narcotics violations inside the trash bags. The Court held that there could be no reasonable expectation of privacy in the discarded inculpatory items because "[i]t is common knowledge that plastic garbage bags left on or at the side of a public street are readily accessible to animals, children, scavengers, snoops, and other members of the public." *Id.* at 40, 108 S.Ct. at 1628–29 (footnotes omitted). Moreover, the Court stated, Greenwood left the garbage at the point of collection for the purpose of conveying it to a third party, who might have rummaged through the bags or allowed someone else to do so. *Id.* at 40–41, 108 S.Ct. at 1628–29. Greenwood could have no reasonable expectation of privacy in his garbage under these circumstances because it was readily accessible to inspection by the public.

*Greenwood* concerned a search of garbage outside the curtilage, but the constitutional standard announced in that case is not confined to searches outside the curtilage. Rather, *Greenwood* mandates that the touchstone of reasonableness in this context is whether the trash is readily accessible to the public; location is merely one factor in that inquiry. The *Greenwood* Court stated that "society would not accept as reasonable respondents' claim to an expectation of privacy in trash left for collection in an area accessible to the public". *Id.* at 41, 108 S.Ct. at 1629. Location is a factor in assessing the "readiness" of accessibility, but it is not the only or ultimate consideration.

My dissenting colleagues express disagreement with the holding of *Greenwood,* but since overruling *Greenwood* is not in our power, they draw a proverbial line in the sand at the curtilage. Under this approach, garbage outside the curtilage would be fair game for warrantless searches, but once a court determines that the garbage is located within the curtilage, the search would become unconstitutional. While I can identify with the core concerns expressed by the dissenters, I do not believe that their approach is compatible with the controlling authority.

Our Circuit has applied a curtilage-neutral accessibility standard in approving three warrantless trash searches since *Greenwood.*[2] Our most recent case of this sort was *United States v. Shanks,* 97 F.3d 977, 978 (7th Cir.1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 1002, 136 L.Ed.2d 881 (1997). Police in that case searched garbage containers

1. The Court assumed that the garbage rested outside the curtilage of Greenwood's home. *See* 486 U.S. at 37, 108 S.Ct. at 1627 ("The issue here is whether the Fourth Amendment prohibits the warrantless search and seizure of garbage left for collection outside the curtilage of a home.").

2. Post-*Greenwood* cases from other circuits have also applied the accessibility test without regard to curtilage when evaluating the constitutionality of warrantless trash searches. *See, e.g., United States v. Hall,* 47 F.3d 1091, 1096–97 (11th Cir.) (approving warrantless search of a dumpster located in the parking lot of the appellant's business—his "commercial curtilage"—because it was readily accessible to the public), *cert. denied,* 516 U.S. 816, 116 S.Ct. 71, 133 L.Ed.2d 31 (1995); *United States v. Comeaux,* 955 F.2d 586,

589 (8th Cir.) (stating that curtilage was irrelevant to the court's approval of a warrantless search of a garbage bag located next to the appellant's garage adjacent to public alley because the bag was readily accessible to the public), *cert. denied,* 506 U.S. 845, 113 S.Ct. 135, 121 L.Ed.2d 89 (1992); *United States v. Wilkinson,* 926 F.2d 22, 27 (1st Cir.1991) (approving a warrantless search of a garbage left for collection on the appellant's lawn next to the curb based on its ready accessibility and without mentioning curtilage) (Breyer, C.J.), *cert. denied,* 501 U.S. 1211, 111 S.Ct. 2813, 115 L.Ed.2d 985 (1991), *and overruled on other grounds, Bailey v. United States,* 516 U.S. 137, 149–51, 116 S.Ct. 501, 508–09, 133 L.Ed.2d 472 (1995). *But see United States v. Certain Real Property Located at 987 Fisher Road,* 719 F.Supp. 1396, 1404, 1405–06 (E.D.Mich.1989) (holding that a warrantless

located adjacent to a public alley and next to a garage twenty feet from the appellant's residence. The Court did not address whether the containers were located at the point of collection. In assessing the reasonableness of the warrantless search, we noted that "the mere intonation of curtilage does not end the inquiry," *id.* at 979. Shanks did not have a reasonable expectation of privacy in his garbage "[e]ven assuming that the garbage containers were within the curtilage of Shanks' home," *id.*, because the containers were readily accessible from a public thoroughfare and because such garbage is commonly invaded by snoops, scavengers, and other members of the public. *Id.* at 980.

In *United States v. Hedrick*, 922 F.2d 396 (7th Cir.), *cert. denied*, 502 U.S. 847, 112 S.Ct. 147, 116 L.Ed.2d 113 (1991), we allowed officers to search garbage at the point of collection in a location that we explicitly held to be within the curtilage of the appellant's home. *See id.* at 399 ("Therefore, the garbage cans located 20 feet from the garage and approximately 50 feet from the back door of the house were technically within the curtilage of the home, in which privacy interests are most heightened."). We nonetheless emphasized that "applying the *Greenwood* analysis to garbage *within the curtilage,* the relevant inquiry is whether the garbage cans were so readily accessible to the public that they exposed the contents to the public for Fourth Amendment purposes." *Id.* at 400 (emphasis added); *see also id.* at 399 ("[C]ontainers or sheds within the curtilage would not be protected if their contents could be viewed by people routinely passing on the street or overhead."). We affirmed the search in *Hedrick* because the garbage cans were readily accessible to the public in light of the relatively short distance between the cans and the public sidewalk, as well as the fact that the cans were normally collected from that location by a sanitation service. *Id.* at 400. The Court's determination of ready accessibility also took into consider-

ation *Greenwood*'s observations regarding the common practices of our recurring cast of "scavengers, snoops, and other members of the public in sorting through garbage." *Id.*

Our first consideration of a warrantless trash search after *Greenwood* occurred in *United States v. Dunkel*, 900 F.2d 105 (7th Cir.1990), *vacated in part on other grounds*, 498 U.S. 1043, 111 S.Ct. 747, 112 L.Ed.2d 768 (1991). In that case, a government informant found incriminating financial records in a dumpster located within an area that the appellant claimed to be the "curtilage" of his business. Seven other commercial tenants shared this dumpster, which was located on the outer edge of the building's parking lot. We affirmed the district court's holding that the search did not violate Dunkel's Fourth Amendment rights because the dumpster was accessible to the public (especially to the other seven commercial tenants). *Id.* at 106–07. In doing so, we did not formally address Dunkel's curtilage argument other than to dismiss its relevance to his Fourth Amendment claim: "Intoning 'curtilage' does not alter the fact that the parking lot was open to all comers—not only Dunkel's invitees but also those of his seven tenants." *Id.* at 107. Finally, we offered an endorsement of the ready accessibility test: "Someone who tosses documents into a dumpster to which hundreds of people have ready access has no legitimate expectation of privacy in the dumpster or its contents." *Id. Shanks*, *Hedrick*, and *Dunkel* therefore reflect our Circuit's understanding that—regardless of curtilage issues—warrantless searches of readily accessible trash do not violate the Fourth Amendment.

This view is consistent with our trash search cases that preceded the Supreme Court's decision in *Greenwood*. In *United States v. Shelby*, 573 F.2d 971 (7th Cir.), *cert. denied*, 439 U.S. 841, 99 S.Ct. 132, 58 L.Ed.2d 139 (1978), we held that a warrantless search of garbage was constitutionally permissible. In that case, police officers obtained a search warrant of the appellant's house based upon evidence found in a warrantless search of his garbage. At the be-

search of garbage located within the curtilage of the defendant's home violated his Fourth Amend-

ment rights).

hest of the police, sanitation workers—as was their usual custom—removed the trash by reaching over a small fence on the appellant's property adjoining a public alley. The trash was located inside a low fence on the appellant's property, and we assumed that area to be within the curtilage of his home. *See id.* at 974 n. 7. Despite that fact, we nevertheless held that "the 'seizure' of the garbage *from the defendant's curtilage* did not violate the Fourth Amendment," *id.* (emphasis added), because the appellant could have no reasonable expectation of privacy in garbage placed at the point of collection and within easy public access, *see id.* at 973–74.

Similarly, in *United States v. Kramer*, 711 F.2d 789, 794 (7th Cir.), *cert. denied*, 464 U.S. 962, 104 S.Ct. 397, 78 L.Ed.2d 339 (1983), we held that the appellant did not have a reasonable expectation of privacy in his garbage that the police searched without a warrant. The police removed plastic garbage bags from containers located by the roadside in front of Kramer's house; the cans were at the point of collection inside a knee-high fence. Kramer sought to suppress records of marijuana sales found amidst his garbage. In affirming the district court's denial of Kramer's motion to suppress the records, we stated quite curtly that "the special protection the Fourth Amendment accords people in their 'persons, houses, papers, and effects' does not extend to their discarded garbage." *Id.* at 792.

I consider the Court's holding today to be plainly compelled by *Greenwood.* I do not necessarily share the view of garbage expounded by the Supreme Court, but that is of little moment to the present task; *Greenwood* is the law and we must apply it. Whatever ambiguities one can mine from the *Greenwood* decision with regard to the importance of curtilage (which I do not find), I think that our Circuit precedent fills in those gaps. I recognize that Circuit law is vulnerable to revision upon en banc review, but I believe that our cases have executed *Greenwood*'s mandate faithfully and do not warrant reconsideration. Without further direction from the Supreme Court, I cannot subscribe to limiting *Greenwood* in the manner proposed by the dissenters and thereby overrule a significant body of our precedent.

I agree with the Majority that Redmon's garbage in this case was readily accessible to the public. Our decisions demonstrate that the placement of trash at the point of collection goes a long way toward establishing ready accessibility. *See Hedrick*, 922 F.2d at 400; *Kramer*, 711 F.2d at 794; *Shelby*, 573 F.2d at 973; *see also Greenwood*, 486 U.S. at 41, 108 S.Ct. at 1629. In the instant case, Redmon placed his garbage on his driveway, which served as his usual point of collection. As the Majority opinion points out, a municipal ordinance forbade Redmon from depositing his garbage for collection at the curbside. In other words, once Redmon left the trash for collection in his driveway, it occupied a space that—for purposes of his expectation of privacy in the garbage (and, as I will argue later, his abandonment of the trash)— was not much different than the curbside collection point chosen in other cases.

Besides its role as the point of collection, the driveway location severely limited Redmon's reasonable expectation of privacy in his trash in other ways, as well. Redmon shared the driveway with his next-door neighbor. Once he placed his garbage in an area of property shared with this neighbor, he gave the neighbor (and the neighbor's visitors and guests) access to the trash. People generally exclude others from certain areas in order to maintain privacy, and they understand that their expectation of privacy diminishes (if not evaporates) as others gain access to those areas.

In addition, the driveway served as part of the walkway to Redmon and his neighbor's front doors. Invited guests of both Redmon and his neighbor, as well as members of the general public (implicit guests, as the Majority notes), were required to walk past the trash cans sitting in the driveway. This does not imply that the guests were likely to begin rummaging through the contents of the nearby trash cans or bags; it does, however, suggest that the trash was readily accessible to members of the public who desired to do so. The relatively short distance between the garbage in the driveway and the public

sidewalk also supports the Government's position that the trash was readily accessible.

The totality of circumstances in this case convinces me that Redmon did not have a reasonable expectation of privacy in the searched garbage. The trash was readily accessible to the public—the applicable standard prescribed by *Greenwood*.[3] Thus, I concur in the decision of the Court today.

## II.

My dissenting colleagues make much of the importance of curtilage in the determination of Redmon's expectation of privacy. I must respectfully disagree with their approach. I believe that the analytical circularity of the curtilage inquiry only confuses what is already a difficult task in deciding Fourth Amendment issues. I think that curtilage is a vestigial concept largely lacking in substantive content, and I feel the need to comment on its role in our warrantless trash search cases.

Curtilage receives protection under the Fourth Amendment because it is "an area intimately linked to the home, both physically and psychologically, where privacy expectations are most heightened." *California v. Ciraolo*, 476 U.S. 207, 213, 106 S.Ct. 1809, 1812, 90 L.Ed.2d 210 (1986). The Supreme Court has stated that curtilage is "the area to which extends the intimate activity associated with the 'sanctity of a man's home and the privacies of life.'" *Oliver v. United States*, 466 U.S. 170, 180, 104 S.Ct. 1735, 1742, 80 L.Ed.2d 214 (1984) (quoting *Boyd v. United States*, 116 U.S. 616, 630, 6 S.Ct. 524, 532, 29 L.Ed. 746 (1886)). The Court has prescribed a multi-factor test to guide curtilage determinations:

[C]urtilage questions should be resolved with particular reference to four factors: the proximity of the area claimed to be curtilage to the home, whether the area is included within an enclosure surrounding the home, the nature of the uses to which the area is put, and the steps taken by the resident to protect the area from observation by people passing by.

*United States v. Dunn*, 480 U.S. 294, 301, 107 S.Ct. 1134, 1139, 94 L.Ed.2d 326 (1987). The third of these factors, by the Court's own admission, is the "centrally relevant consideration," *id.*, and the "primary focus," *id.* at 301 n. 4, 107 S.Ct. at 1140 n. 4; this accords with the Court's long-standing definition of curtilage from *Boyd*. Curtilage is thus essentially defined as an area that receives heightened Fourth Amendment protection by virtue of the uses to which it is put and the extent to which those uses are exposed to the public.

To my mind, this is yet another in a long line of tests that merely restates the ultimate Fourth Amendment standard of reasonableness. When we decide that trash is within the curtilage, we have concluded that a person has a reasonable expectation of privacy in that trash based, among other things, on the degree of exposure of that trash to the public. Indeed, activities are regarded as "intimate" or "private" precisely because the general public is excluded from them in some fashion. This is no different than the inquiry prescribed by the "ready accessibility" test. By definition, an area containing trash cannot be defined as curtilage if it is readily accessible to the public; similarly, by definition, the trash contained therein cannot receive Fourth Amendment protection if it is readily accessible. Put another way, if someone takes enough steps to guard the privacy of a particular area so that it is deemed to be curtilage, they will also have exhibited a reasonable expectation of privacy in the trash found in that area. For this reason, any time that courts declared that trash was searched

---

3. When determining whether trash is readily accessible, courts must ensure that the term "readily" maintains substantive force. "Readily" does not mean "possibly," and trash is not *readily* accessible just because it is visible to passers-by on the street or vulnerable to scavenging expeditions of various enterprising animals and people. Courts must consider all aspects of the search in assessing whether trash was indeed *readily* accessible. Within this calculus, important factors include the proximity of the garbage to the defendant's home, the garbage's distance from any public thoroughfare, the ease with which the public could reach the garbage without disturbing the intimate activities of the defendant's home life, and the unique societal message of abandonment that attaches to trash as opposed to other objects located on the defendant's property. This non-exhaustive list illustrates that the ready accessibility test essentially reformulates the totality-of-circumstances reasonableness standard itself.

in the curtilage of a defendant's home, they would have already decided that the defendant had a reasonable expectation of privacy in the trash.[4]

In this way, curtilage is a descriptive—rather than a prescriptive—term in our Fourth Amendment jurisprudence. Curtilage cannot define a defendant's reasonable expectation of privacy when the very same reasonable expectation is the basis for defining curtilage in the first place. Thus, instead of aiding our Fourth Amendment inquiry in trash search cases, curtilage merely adds another co-extensive layer of tests and factors to the reasonableness calculus. For these reasons, I cannot join my colleagues' dissenting opinions that rely on curtilage to bring clarity—or a change of any sort—to our constitutional inquiry in trash search cases.

### III.

Finally, I would also like to comment on the role of abandonment theory in cases involving warrantless searches of garbage. Abandonment is a consideration when assessing the reasonableness of a defendant's expectation of privacy in his garbage—specifically, in assessing the degree of public accessibility of his trash. Abandonment of property sends a message to members of the public implicitly granting them permission to approach, to investigate, and—if they so desire—to convert the property to their own uses. In this way, I believe that abandonment principles can inform a court's evaluation of the ready accessibility of garbage.

#### A. The Continuing Viability of Abandonment Theory

To paraphrase Mark Twain, reports of the death of abandonment theory in trash search cases have been greatly exaggerated. Jus-

tice Brennan's dissenting opinion in *Greenwood* made two references to the Majority's supposed rejection of abandonment theory. *See* 486 U.S. at 49 n. 2, 108 S.Ct. at 1633 n. 2 (Brennan, J., dissenting) (noting that many of the courts of appeals cases cited approvingly by the Majority "rely entirely on an abandonment theory that, as noted *infra*, at 1629, the Court has discredited."); *id.* at 50, 108 S.Ct. at 1634 ("The Court properly rejects the State's attempt to distinguish trash searches from other searches on the theory that trash is abandoned and therefore not entitled to an expectation of privacy."). A careful reader of *Greenwood*, however, will search in vain for the Majority's purported disavowal of abandonment theory.

In fact, the page cited by Justice Brennan for this proposition demonstrates that abandonment was an important component of the Majority's holding that Greenwood's garbage was readily accessible. After noting that "respondents exposed their garbage to the public sufficiently to defeat their claim to Fourth Amendment protection," *id.* at 40, 108 S.Ct. at 1628, the Court went on to explain that this conclusion was appropriate because, among other things, "respondents placed their refuse at the curb for the express purpose of conveying it to a third party, the trash collector, who might himself have sorted through respondents' trash or permitted others, such as the police, to do so." *Id.* In summing up the rationale for its holding, the Court again noted the importance of abandonment principles: "Accordingly, having deposited their garbage 'in an area particularly suited for public inspection and, in a manner of speaking, public consumption, for the express purpose of having strangers take it,' respondents could have had no reasonable expectation of privacy in the inculpatory items that they discarded."

---

4. I recognize the apparent inconsistency of arguing both that curtilage is co-extensive with Fourth Amendment protection and that our Circuit has previously held that garbage within the curtilage may be searched without a warrant. Under my theory, a determination that the trash was located in the curtilage should have ended the Fourth Amendment inquiry. I can only answer this charge by saying that I disagree with the Court's curtilage determinations in *Hedrick*, 922 F.2d at 399, which relied on an assumption that the entire front yard of a residential home is

*ipso facto* curtilage, and in *Shelby*, 573 F.2d at 974 n. 7, which assumed (without deciding) that garbage cans inside a low fence adjacent to a public alley at the point of collection were located in the curtilage. Our other cases in this area did not make formal curtilage determinations because they found it irrelevant (and I would argue, redundant) to their ultimate Fourth Amendment holdings. *See Shanks*, 97 F.3d at 979–80; *Dunkel*, 900 F.2d at 107; *Kramer*, 711 F.2d at 794.

*Id.* at 40–41, 108 S.Ct. at 1628–29 (citation omitted). The quoted passage in this summation came from a Third Circuit case which squarely held that placement of trash at the point of collection signifies abandonment. *United States v. Reicherter,* 647 F.2d 397, 399 (3d Cir.1981).

Indeed, *Reicherter* was not the only lower court opinion applying abandonment theory that the *Greenwood* Court cited with approval. The Court stated that "[o]ur conclusion that society would not accept as reasonable respondents' claim to an expectation of privacy in trash left for collection in an area accessible to the public is reinforced by the unanimous rejection of similar claims by the Federal Courts of Appeals." *Greenwood,* 486 U.S. at 41, 108 S.Ct. at 1629. In support of this proposition, the Court cited nine cases, *seven* of which expressly based their holdings on an abandonment theory. *Id.* at 41–42, 108 S.Ct. at 1629–30. In addition, the Court referenced fifteen decisions from state appellate courts involving warrantless trash searches; nine of these state courts utilized an abandonment theory in approving the disputed searches. *Id.* at 42–43, 108 S.Ct. at 1629–30. Perhaps in part for these reasons, the First Circuit has stated that, contrary to Justice Brennan's interpretation, *Greenwood* did not reject abandonment theory as an element of its holding. *See United States v. Scott,* 975 F.2d 927, 930 n. 1 (1st Cir.1992), *cert. denied,* 507 U.S. 1042, 113 S.Ct. 1877, 123 L.Ed.2d 495 (1993).

One of the federal appellate decisions cited approvingly by the *Greenwood* Court was our decision in *United States v. Kramer,* 711 F.2d 789, 792 (7th Cir.), *cert. denied,* 464 U.S. 962, 104 S.Ct. 397, 78 L.Ed.2d 339 (1983), in which we approved a warrantless trash search based on abandonment theory. The *Kramer* Court stated quite bluntly that *all* garbage was to be considered abandoned: "We agree with the trial judge that the special protection the Fourth Amendment accords people in their 'persons, houses, papers, and effects' does not extend to their discarded garbage.... There is nothing unfair about requiring that people not discard things they want to keep secret, or destroy them before they do." *Id. Kramer,* in turn, relied upon our earlier decision in *United States v. Shelby,* 573 F.2d 971, 973 (7th Cir.),

*cert. denied,* 439 U.S. 841, 99 S.Ct. 132, 58 L.Ed.2d 139 (1978), which also applied abandonment theory to determine the constitutionality of a warrantless garbage search:

> In our view the placing of trash in the garbage cans at the time and place for anticipated collection by public employees for hauling to a public dump signifies abandonment. Defendant may have decided to assume the risk, calculating no one would think to search in his garbage can, or he may have been careless, but whatever his reason he evidenced an intent in a convenient but risky way to permanently disassociate himself from the incriminating contents.

As I explain later, I do not agree that abandonment theory compels *Kramer* and *Shelby*'s broad conclusion that garbage never enjoys constitutional protection, but I do not interpret Greenwood to preclude the continued application of abandonment principles.

### B. The Contours of Abandonment Theory

The basic rule of abandonment theory is that police inspections of abandoned property are not "searches" and therefore are not regulated by the Fourth Amendment. For instance, police may lawfully seize contraband cast away by a fleeing suspect because the contraband has been abandoned by the suspect. *See California v. Hodari D.,* 499 U.S. 621, 629, 111 S.Ct. 1547, 1552, 113 L.Ed.2d 690 (1991). Similarly, a closed container is considered abandoned and therefore subject to search when the suspect disavows ownership of the container. *See, e.g., United States v. Knox,* 839 F.2d 285, 293 (6th Cir. 1988), *cert. denied,* 490 U.S. 1019, 109 S.Ct. 1742, 104 L.Ed.2d 179 (1989). Abandonment, in the sense of discard, has even been extended by some courts to justify warrantless thermal scans, although I think these cases may stretch abandonment theory too far. *See, e.g., United States v. Pinson,* 24 F.3d 1056, 1058–59 (8th Cir.) (relying on abandonment principles to uphold thermal scans because they detect discarded heat), *cert. denied,* 513 U.S. 1057, 115 S.Ct. 664, 130 L.Ed.2d 598 (1994).

Courts often distinguish the concept of abandonment in the Fourth Amendment con-

text from abandonment as defined by property law. In property law, abandonment is a term denoting total relinquishment of property rights, which thereby enables a finder or subsequent possessor of the property to assert an unassailable interest. When describing abandonment in the constitutional sense, however, many courts explain that the relevant inquiry is not whether the defendant abandoned the *property;* rather, the issue is whether the defendant abandoned his or her *reasonable expectation of privacy* in the property by relinquishing possession or disavowing ownership. *See, e.g., United States v. Barlow,* 17 F.3d 85, 88 (5th Cir.), *cert. denied,* 513 U.S. 850, 115 S.Ct. 148, 130 L.Ed.2d 88 (1994); *New Jersey v. Hempele,* 120 N.J. 182, 576 A.2d 793, 808–09 (1990); *City of St. Paul v. Vaughn,* 306 Minn. 337, 237 N.W.2d 365, 370–71 (1975).

Understood in this way, however, abandonment in the Fourth Amendment context becomes circular. Courts have set forth the following general principle of abandonment theory: Because there is no reasonable expectation of privacy in abandoned property, the Fourth Amendment does not regulate inspections of it. But the purported test for abandonment in the constitutional sense is whether the previous owner demonstrates an intent to relinquish his or her expectation of privacy in the property. Thus, the logic reduces to the following tautology: Because there is no reasonable expectation of privacy in property in which the owner has relinquished his expectation of privacy, the Fourth Amendment does not regulate inspections of it. This formulation of abandonment in the constitutional sense adds nothing to the analysis. *See Hempele,* 576 A.2d at 809–10. In short, a conclusion that one has "abandoned" one's reasonable expectation of privacy is just another way of saying that there is no reasonable expectation of privacy, and that therefore a warrantless search may proceed.

Courts have adopted this purported distinction between constitutional and common-law abandonment because of the hornbook principle that the boundaries of Fourth Amendment law are not defined by property-law concepts. *Oliver v. United States,* 466 U.S. 170, 183–84, 104 S.Ct. 1735, 1743–44, 80 L.Ed.2d 214 (1984). Indeed, there is a real difference between property-law and constitutional abandonment, for courts have repeatedly found abandonment for constitutional purposes in situations that might not support a finding of abandonment in the common-law understanding. For instance, courts have held that suspects fleeing the police who discard or hide incriminating evidence have abandoned that evidence even where it is clear that they intended to return and retrieve the evidence had they eluded capture. *See United States v. Thomas,* 864 F.2d 843, 845–47 (D.C.Cir.1989); *Vaughn,* 237 N.W.2d at 370–71. In light of these cases, the difference between constitutional and common-law abandonment may simply be that the level of proof required may be lower, and therefore abandonment may be easier to establish, in the Fourth Amendment context.

In my view, if abandonment is to retain some meaning in the Fourth Amendment context, it cannot be totally divorced from its property-law antecedents. It is true that the scope of Fourth Amendment protections is independent of property-law concepts, but this does not mean that property-law concepts cannot inform the constitutional inquiry. The same evidence supporting a conclusion of property abandonment in the common-law understanding—such as relinquishment of possession or disavowal of ownership—will almost always support a conclusion of abandonment for Fourth Amendment purposes. For instance, placement of trash at the point of collection sends a strong signal of abandonment of that property; this factor therefore suggests that the garbage is readily accessible to the public.

As I have indicated earlier, I believe that abandonment concepts, properly understood, can play a useful role as one factor to be considered in our Fourth Amendment "reasonableness" determinations. The key, as always, is the reasonableness of the disputed search, and the more indication there is that property has been abandoned, the more reasonable it becomes to conduct a warrantless search of that property. Relinquishment of possession, disavowal of ownership, and other indicia of abandonment should be considered

along with the other relevant factors in our fact-intensive Fourth Amendment inquiries. No one factor can be a talismanic indicator of reasonableness; courts must consider all factors, and abandonment is only one among many. But if abandonment concepts can assist courts in conducting Fourth Amendment inquiries, we should not assent so readily in critics' tales of its demise.

## IV.

I believe that the Supreme Court's decision in *Greenwood* speaks broadly enough to cover the circumstances of the present case. *Greenwood* instructed courts to apply a "ready accessibility" test in trash search cases, and the Court did not limit the scope of this test to locations outside the curtilage. Trash does not enjoy constitutional protection if it is readily accessible to the public, as was Redmon's in this case, and the location of the garbage is merely one factor in that assessment of ready accessibility. Indeed, I do not believe that a curtilage-based approach would be helpful to our evaluation of reasonableness; it is neither analytically instructive nor consistent with *Greenwood* and our Circuit's precedent. Abandonment principles, on the other hand, can provide valuable insights into the ready accessibility of garbage. For these reasons, I concur in the Court's decision affirming the district court's denial of Redmon's motion to suppress.

EVANS, Circuit Judge, concurring.

"Curtilage" is a dated term that relates better to a time when knights in shining armor rescued damsels in distress. It is not a particularly well-suited term for deciding suppression motions alleging violations of the Fourth Amendment in federal criminal cases. It is, nevertheless, the term we use, and I join the majority because I believe the garbage cans, placed as they were for collection outside of the garage on the driveway Redmon shared with the occupant of the adjoining townhouse, was not within the curtilage of the townhouse unit in which he lived.

An area is considered part of the curtilage of a dwelling if it "is so intimately tied to the home itself that it should be placed under the home's 'umbrella' of Fourth Amendment protection." *United States v. Dunn*, 480 U.S. 294, 107 S.Ct. 1134, 94 L.Ed.2d 326 (1987).

The curtilage is protected because people enjoy a reasonable expectation of privacy in those areas intimately associated with the home in which they live. But it's simply an unfortunate fact of life that in a modern urban setting—a multi-family apartment building, or as here an 8–unit townhouse complex—the area where one can reasonably expect privacy to prevail is very narrow. In a multi-unit apartment building there may in fact be no curtilage except perhaps in a separate area—like a basement storage locker—subject to one's exclusive control. In a townhouse complex like Redmon's the curtilage is a bit wider. It includes the garage itself and those areas close to the living unit, particularly places where prying eyes can peer into windows. But Redmon's curtilage does not include the shared concrete driveway outside of his shared garage. When Redmon moved his garbage cans outside of his garage on collection days to his shared driveway, which was less than a first down's distance from the public sidewalk, he moved them beyond his curtilage. As the cans sat there waiting to be picked up by the garbage collectors, Redmon had no reasonable expectation that their contents would remain undisclosed.

POSNER, Chief Judge, with whom RIPPLE, MANION, ROVNER, and DIANE P. WOOD, Circuit Judges, join, dissenting.

The defendant lived in a house with an attached garage that was at the end of a driveway 28 feet from the public street. He kept his garbage cans in the garage, but when a garbage pickup was due he would take them out of the garage and place them on the driveway right next to the garage rather than, as would be more common but also unsightly and forbidden by a local ordinance, at the curb of the public street. Presumably—although the record is silent on this—the garbage collectors would walk up his driveway, carry the cans to the street, empty them into their truck, and return the cans to their place in front of the garage. The question raised by Redmon's appeal is whether the police could, consistently with the Fourth Amendment, walk up the driveway and search the cans, without a warrant or probable cause, while the cans were up

against the garage awaiting the garbage collectors. The odd thing about the answer given by the majority opinion—"yes"—is that it will complicate the administration of the law without conferring any practical benefit on law enforcers. The better answer would be that searches, including searches of garbage, that take place within the curtilage of the defendant's property must comply with the Fourth Amendment's restrictions on searches. The search here took place within the defendant's curtilage, and so his conviction should be reversed.

The Fourth Amendment confers a right to security of person, home, papers, and effects against unreasonable searches and seizures by the authorities. It is tempting to suppose that the search of a garbage can could never violate that right because the act of discarding something as trash or garbage is a relinquishment of any interest in it. But that answer must be wrong, *United States v. Kramer*, 711 F.2d 789, 793 (7th Cir.1983); see also *United States v. Hedrick*, 922 F.2d 396, 400 (7th Cir.1991); *United States v. Biondich*, 652 F.2d 743, 745 (8th Cir.1981), as it would entitle the police to enter the home itself and rifle the trash cans and wastepaper baskets found there, supposing they could do this without committing a breach of the peace (as they could by pretending to be servicemen of one sort or another). Yet it is equally well established in the case law that once the garbage is taken away by the garbage collectors, the (former) owner of the garbage has no right to complain if the police, without bothering to get a warrant or otherwise demonstrating the reasonableness of the search, go through the garbage and find contraband or evidence of crime to use against him. *California v. Greenwood*, 486 U.S. 35, 39–41, 108 S.Ct. 1625, 1628–29, 100 L.Ed.2d 30 (1988); *United States v. Biondich, supra*, 652 F.2d at 745; *United States v. Shelby*, 573 F.2d 971, 973, 974 n. 7 (7th Cir.1978).

To locate this case between these poles requires consideration of the interests that the Fourth Amendment may be taken to protect, as that will reveal what scope to give the right that the amendment confers but does not define. For the right is personal to the person asserting it. E.g., *Rakas v. Illinois*, 439 U.S. 128, 138–40, 99 S.Ct. 421, 427–29, 58 L.Ed.2d 387 (1978). A search that does not invade an interest of the kind that the amendment protects is lawful no matter how unreasonable in the sense that solid grounds for suspicion of criminal activity are lacking.

Historically the amendment protected property rights and was violated only by a trespass or other infringement of such rights. *Goldman v. United States*, 316 U.S. 129, 134–36, 62 S.Ct. 993, 995–97, 86 L.Ed. 1322 (1942); *Olmstead v. United States*, 277 U.S. 438, 464–66, 48 S.Ct. 564, 567–69, 72 L.Ed. 944 (1928). The historic construal might seem to help the defendant here, since the police were trespassers to both his real and his personal property, the driveway and the garbage cans. But because the sanction for violating the Fourth Amendment is usually (and would be here) the exclusion of evidence that might be vital to the conviction of a person who had committed a serious crime, the courts have long overlooked minor trespasses, *Hester v. United States*, 265 U.S. 57, 59, 44 S.Ct. 445, 446, 68 L.Ed. 898 (1924) (Holmes, J.), including the search of a garbage pail when it is at or right next to the curb awaiting pickup. *United States v. Kramer, supra*, 711 F.2d at 792–94; *United States v. Comeaux*, 955 F.2d 586, 588–89 (8th Cir.1992); *United States v. Wilkinson*, 926 F.2d 22, 27 (1st Cir.1991); *Magda v. Benson*, 536 F.2d 111 (6th Cir.1976) (per curiam). To punish a minor trespass by the acquittal of a criminal would be a disproportionately severe sanction for a harmless violation of property rights.

It is tempting to view the present case in that light. Although the garbage cans were not adjacent to the curb, they were awaiting pickup, and it might not seem to make much difference whether the police sneak up the driveway and search the garbage there or wait until it has been taken to the garbage truck at curbside. (I am assuming the garbage truck does not drive into the driveway for the pickup, though as I have already noted there is nothing in the record about the details of the garbage collection.) Both are trespasses. But reaching a few inches over someone's property line is a petty trespass, *Hannabalson v. Sessions*, 116 Iowa

457, 90 N.W. 93 (1902), while marching up his driveway to rummage through the garbage cans placed at the head of the driveway is not. It is true that the garbagemen had permission to march up to the garage to get the cans, just as there is an implicit permission for friends, service people, and many others to march up to one's front door. *Oregon v. Portrey,* 134 Or.App. 460, 896 P.2d 7, 9 (1995). But one's right to complain about a trespass does not depend on one's refusing to invite anyone onto any part of his property, for then only hermits (and not all of them) would have property rights.

The courts have distinguished between petty and menacing trespasses with the help of the old common law doctrine of "curtilage." The curtilage is the "area intimately linked to the home, both physically and psychologically," *California v. Ciraolo,* 476 U.S. 207, 212–13, 106 S.Ct. 1809, 1812, 90 L.Ed.2d 210 (1986), and is distinguished from "open fields," which "do not provide the setting for those intimate activities that the [Fourth] Amendment is intended to shelter from government interference or surveillance." *Oliver v. United States,* 466 U.S. 170, 179, 104 S.Ct. 1735, 1741, 80 L.Ed.2d 214 (1984); see also *Hester v. United States, supra,* 265 U.S. at 59, 44 S.Ct. at 446. In the common law of England the curtilage was the part of a person's property that a criminal had to break into in order to be guilty of burglary. *United States v. Dunn,* 480 U.S. 294, 300 and n. 3, 107 S.Ct. 1134, 1139 and n. 3, 94 L.Ed.2d 326 (1987). Since burglary was a capital offense, there was a felt need to confine it to the most alarming forms of breaking and entering. The line between curtilage and open fields is not precise, but depends primarily on proximity to the owner's house, *id.* at 301, 107 S.Ct. at 1139–40, and on the use to which the part of the property in question is put—whether it is a private use not open to the public gaze, see, e.g., *United States v. Depew,* 8 F.3d 1424 (9th Cir.1993), as evidenced by whether the owner has enclosed it or taken other steps to shield it from public view. *United States v. Dunn, supra,* 480 U.S. at 301, 107 S.Ct. at 1139–40.

The curtilage would rarely extend beyond the house itself if complete, opaque enclosure were required. Few people, other than the very wealthy, barricade their front yard so completely that a person seeking to enter must request the unlocking of a solid gate that is higher than eye level. Most homeowners extend an implicit invitation to social and business invitees to walk up to the front door, but in doing so the homeowner does not, as it were, "waive curtilage." The social and business invitee, including a police officer whether invited or uninvited, must confine himself to the prescribed route, rather than treating the invitation as one to roam the property at will, peering into the windows of the home. *Oregon v. Portrey, supra,* 896 P.2d at 9; cf. *Horton v. California,* 496 U.S. 128, 136, 110 S.Ct. 2301, 2307–08, 110 L.Ed.2d 112 (1990); *Walter v. United States,* 447 U.S. 649, 656–57, 100 S.Ct. 2395, 2401–02, 65 L.Ed.2d 410 (1980); *United States v. Garcia,* 997 F.2d 1273, 1279 (9th Cir.1993); *United States v. Thomas,* 120 F.3d 564, 568, 571 (5th Cir.1997).

These may seem fussy distinctions. But ever since the invention of wiretapping, which is a nontrespassory invasion of home or office, emphasis in the interpretation and application of the Fourth Amendment has shifted from the protection of property to the protection of privacy. See, e.g., *O'Connor v. Ortega,* 480 U.S. 709, 715, 107 S.Ct. 1492, 1496–97, 94 L.Ed.2d 714 (1987); *Katz v. United States,* 389 U.S. 347, 353, 88 S.Ct. 507, 512, 19 L.Ed.2d 576 (1967); *United States v. Concepcion,* 942 F.2d 1170 (7th Cir.1991). The emphasis that the courts have given to the distinction between "curtilage" and "open fields," and to the association of the former concept with intimacy, e.g., *Oliver v. United States, supra,* 466 U.S. at 179, 104 S.Ct. at 1741–42; *California v. Ciraolo, supra,* 476 U.S. at 212–13, 106 S.Ct. at 1812–13, are instances of this refocusing of concern from the protection of property to the protection of privacy. There is no reason in principle why this development should have involved substitution rather than addition; addition would have been entirely consistent with the fact that the eighteenth-century usage of "property" was broader than the modern, *Vail v. Board of Educ.,* 706 F.2d 1435, 1450 (7th Cir.1983) (dissenting opinion), aff'd. by equally divided Court, 466 U.S. 377, 104 S.Ct. 2144, 80 L.Ed.2d 377 (1984), so that modern property-plus-privacy

might be the equivalent of eighteenth-century property. But rightly or wrongly, privacy has come not merely to supplement but to eclipse property as *the* interest protected by the Fourth Amendment, e.g., *United States v. Hall,* 47 F.3d 1091, 1096 n. 4 (11th Cir. 1995); *United States v. Torres,* 949 F.2d 606, 608 (2d Cir.1991); *United States v. Kramer, supra,* 711 F.2d at 794, property's role being relegated to that of furnishing evidence of the reasonableness of a defendant's expectation of privacy. *Rakas v. Illinois, supra,* 439 U.S. at 143 n. 12, 99 S.Ct. at 430 n. 12; *United States v. Amuny,* 767 F.2d 1113, 1126 (5th Cir.1985). "Because expectations of privacy derive in part from the right to exclude others from the property in question, lawful possession is an important consideration in determining whether a defendant had a legitimate expectation of privacy in the area searched." *United States v. Lyons,* 992 F.2d 1029, 1031 (10th Cir.1993).

Even so, if some judges did not misunderstand privacy, erroneously equating it to secrecy, the shift in emphasis would not have been fatal to the claims of people whose garbage is searched. A garbage can is not a secure repository of secrets, though this is not because, as remarked in the majority opinion, raccoons can get at the garbage; raccoons are not interested in human beings' secrets. Garbage cans are insecure because once the garbage leaves your property you can't physically prevent anyone from going into it and piecing together the letters that you tore up and threw away and reconstructing your balance sheet from your discarded check stubs, and your diet and drinking habits from food refuse and empty bottles, and, if the snoop is a skilled archaeologist, perhaps obtaining over a period of months a detailed picture of your intimate and maybe disreputable private life.

So there are no secrets in garbage. But it doesn't follow that garbage isn't private. Most people don't think about the possibility of serious snooping in their garbage, or can't afford the paper shredders and trash compactors and computer "burn" programs and sink grinders and attics and burn boxes and private landfills that would be necessary, though not necessarily sufficient, see *United States v. Scott,* 975 F.2d 927 (1st Cir.1992), to eliminate all occasions for extruding readable trash and revelatory garbage from home or office. It doesn't follow that one would be unreasonable to be horrified to discover that the archaeologist had been at work reconstructing your life from your garbage and was about to publish a detailed profile of your private life, including your sex life. The tort law of privacy would provide you with a remedy against such a publication. *Doe v. Mills,* 212 Mich.App. 73, 536 N.W.2d 824, 831–32 (1995). I assume that copyright law would provide you with a remedy if one of the things that the archaeologist found and wanted to publish was the discarded first draft of your unpublished novel, as the act of discarding would not be an abandonment of the copyright. *Seshadri v. Kasraian,* 130 F.3d 798, 804–05 (7th Cir.1997). I conclude from these examples that there are legally protected interests in garbage even after it leaves one's property, and I do not see why they should not be interests that the Fourth Amendment protects, once its scope is acknowledged to reach beyond property to privacy.

But this position is not open under the cases. Once the garbage is beyond your property line, the police can search it at will. And though it is within your property line, once it is beyond the curtilage they can search it at will. What is left is the case in which the police have to invade the curtilage in order to get at the garbage. And this is where the line should be drawn. Otherwise, whenever the police spot a garbage can on someone's property they will have at least a colorable case for being allowed to go on the property and search it even though it might turn out not to contain garbage, since garbage cans are not infrequently used for other purposes. And once they reach it, they can of course glance around and if they see contraband or illegal activity through a window of the house and don't have time to get a warrant, they can enter the house and search and arrest. E.g., *Minnesota v. Olson,* 495 U.S. 91, 100, 110 S.Ct. 1684, 1689–90, 109 L.Ed.2d 85 (1990). Most of the "garbage cases" have not involved a search within the curtilage. Cf. *California v. Greenwood, supra,* 486 U.S. at 42, 108 S.Ct. at 1629–30. (The only two that purport to do so that I have found are *United States v. Hedrick,*

*supra,* 922 F.2d at 399–400, and *United States v. Comeaux, supra,* 955 F.2d at 589—and in neither case were the garbage cans in fact within the curtilage, though in both cases the courts assumed they were.) I would give great weight to imperatives of law enforcement that required such a search, but there are none. The police can always arrange with the garbage collectors for the latter to turn over the garbage to the police as soon as it is removed from the owner's property.

If I am right to draw the line at the boundaries of the curtilage, the critical question in this case is whether the place where the garbage cans were set out for collection, at the head of Redmon's driveway, was within his curtilage. I take it, in light of *Ornelas v. United States,* 517 U.S. 690, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996), that this is a question that we are to decide de novo, without deferring to the district court. My answer to the question (the majority opinion does not discuss the question) is "yes." The garage was attached to the house, and the garbage cans were right outside the garage, at the farthest point of the driveway from the street. If this spot was not within Redmon's curtilage—if it is to be classified as an "open field"—then no place outside his house was within the curtilage, and, indeed, attached houses, row houses, and other cramped urban dwellings have no curtilage (beyond the house itself); curtilage is confined to farmers and to wealthy suburbanites and exurbanites.

Of course it is simple realism that people who live in rural areas or have wealth will have more physical privacy than people who live in cities or working-class suburbs, and that therefore they will derive more protection from the Fourth Amendment. That does not trouble me; the wealthy have advantages in every department of life. What does bother me is the idea that the police have carte blanche to invade the property rights of people who by virtue of living on small lots place their garbage cans near their house. It is true that no windows of Redmon's house were visible from the place where the garbage cans were sitting and that the police knew that the cans had been set out for the garbagemen to collect. My colleagues do not announce a rule broader than is necessary to decide this case. But rather than subject the police to the uncertainty of guessing where we will ultimately draw the line, we should adhere to the distinction between the curtilage and open fields, and permit no garbage searches, without a warrant or probable cause, within the curtilage. The alternative rule would be to permit garbage searches anywhere, and, as my colleagues shy away from that extreme, the best rule, the one that best reconciles the interests of privacy, crime control, and ease of administration, is the one I have suggested—drawing the line at the curtilage.

MANION, Circuit Judge, dissenting.

Garbage bagged and contained for collection presumably has little or no value to the discarder. But this case isn't just about garbage; it's about privacy. The issue here is whether police need a warrant to trespass well within an owner's property line in order to rummage through his garbage.

Redmon's garbage was placed right next to his attached garage, not at the curb, as in *California v. Greenwood,* 486 U.S. 35, 40–42, 108 S.Ct. 1625, 1628–30, 100 L.Ed.2d 30 (1988) (no expectation of privacy in trash left for collection on or at the side of a public street in an area accessible to the public). Surely this area next to the garage is within the curtilage. Chief Judge Posner has persuasively addressed the curtilage issue as well as an owner's interest in garbage he places there, and I join his dissenting opinion. It is incorrect to say that Redmon's garbage—like Greenwood's—could be searched by the police because where it was placed was readily accessible to animals, scavengers, and snoops. Greenwood's garbage was not on private property; Redmon's was. The distinction is crucial because unlike in *Greenwood,* here the police trespassed. And it is incorrect to say that because strangers and snoops could have invaded Redmon's property and gone through his garbage, it's okay for the police to do so. They *all* would be trespassers. They are not friends, or guests, or neighbors, or postal people, or joint owners. They are not invitees, or licensees, or any of the above. They are uninvited, unwelcome, and unauthorized. If an owner sees a scavenger or snooper by his

garage rifling through his garbage, when he tells the intruder to leave or he'll call the police, the response should not be "We ARE the police!"

In short, the property line should be respected both by private citizens and peace keepers. The line creates a presumption that an intruder has invaded areas the owner expects are private, unless some other circumstance demonstrates the unreasonableness of that expectation. In most urban settings, the property line is obvious: it is where the sidewalk stops and the yard begins. A driveway, even one shared (as in this case), typically becomes private past the curb or sidewalk, whichever comes last. In cases of larger properties, the presumption of privacy should be more difficult to overcome the closer the invader gets to the owner's dwelling. Redmon's was not a large estate—it was a townhouse with limited (mostly paved) frontage. His curtilage effectively paralleled his property line. Nevertheless, a police officer entered Redmon's property and stood next to his garage door, just a few steps from his front door, and picked through his garbage. The officer stood not in the shoes of a friend, a solicitor, a deliverer or even an invited garbage collector. Rather, he stood in the shoes of a trespasser.

When crossing the property line without a warrant (i.e., trespassing), police should be required to overcome the presumption that the property line defines the perimeter of the curtilage where an owner's expectation of privacy begins. This rule would respect property rights, yet allow police to do their job. But with the court's decision today it is hard now to imagine a circumstance wherein police will need a warrant short of entering the house itself.

ROVNER, Circuit Judge, with whom POSNER, Chief Judge, and RIPPLE, MANION, and DIANE P. WOOD, Circuit Judges, join, dissenting.

In my dissent to the panel opinion in this case, I set forth my view that Joseph Redmon retained a reasonable expectation of privacy in the contents of two garbage cans situated immediately adjacent to the door of his attached garage—clearly within the curtilage of his home—and that as a result of that reasonable expectation of privacy, the warrantless search of the cans by local police violated Redmon's Fourth Amendment rights. *See United States v. Redmon*, 117 F.3d 1036, 1040–44 (7th Cir.) (Rovner, J., dissenting), *vacated, reh'g en banc granted*, 122 F.3d 1081 (7th Cir.1997). I explained there that the two facts which had led the panel majority to reach a contrary conclusion—that Redmon shared the driveway with his neighbor, and that the walkway leading to Redmon's front door could be reached only by traversing the driveway—were not sufficiently significant to overcome this court's view in *United States v. Hedrick*, 922 F.2d 396 (7th Cir.), *cert. denied*, 502 U.S. 847, 112 S.Ct. 147, 116 L.Ed.2d 113 (1991), that "'garbage cans placed next to the house or garage are not so accessible to the public that any privacy expectations are objectively unreasonable.'" *Redmon*, 117 F.3d at 1044 (Rovner, J., dissenting) (quoting *Hedrick*, 922 F.2d at 400). The panel majority's decision, I observed, meant "that the citizens of this circuit may only protect their garbage from warrantless police searches by storing it inside their homes." *Id.* at 1040 (Rovner, J., dissenting).

Having now reheard Redmon's appeal en banc, a majority of our number has reached the same conclusion as the panel—that Redmon's conviction must be affirmed—although a slightly different rationale is now employed to support that decision. But the new facts emphasized by the majority opinion today still do not persuade me that the warrantless search of Redmon's garbage was proper. And despite my colleagues' best efforts to limit the reach of their decision to the specific facts of Redmon's case, it is clear that the implications on law enforcement activity in this circuit will be far-reaching. The majority is understandably hesitant to say it, but in my view, its decision can only mean that nearly any search of a garbage can outside awaiting collection, regardless of where on private property the can may be stored, implicates no privacy interest receiving protection under the Fourth Amendment. That startling conclusion simply is not supported by the Supreme Court's lone decision in this area, or by the earlier garbage-search cases of this or any other circuit. My colleagues,

in fact, recognize that their decision today goes further toward limiting the protectable privacy interests citizens enjoy in garbage stored on their private property than any circuit decision has gone before. (*See ante*, Maj. Op. at 1112.) Because I view this extension of the existing case law to be both unwarranted under the law and unwise in practice, I respectfully dissent.

## I.

The first question that must be asked is whether Redmon's garbage cans were within the curtilage of his home, for if they were not, then I would agree that Redmon lacked a protectable privacy interest in the cans' contents. *See California v. Greenwood*, 486 U.S. 35, 37, 42, 108 S.Ct. 1625, 1627, 1629–30, 100 L.Ed.2d 30 (1988); *Hedrick*, 922 F.2d at 398–99; *see also Oliver v. United States*, 466 U.S. 170, 177, 104 S.Ct. 1735, 1740–41, 80 L.Ed.2d 214 (1984) (government intrusion upon "open fields" not an illegal search proscribed by the Fourth Amendment). But as I explained in my dissent to the panel opinion, and as both Chief Judge Posner (*ante*, Posner, C.J., dissenting, at 1129 & 1132) and Judge Manion (*ante*, Manion, J., dissenting, at 1132) observe in their dissenting opinions here, these cans clearly were within the curtilage of Redmon's home. *See Redmon*, 117 F.3d at 1040–41 (Rovner, J., dissenting). They were just outside the door of a garage leading directly to Redmon's living quarters, on a driveway that Redmon shared with his neighbor. Because the cans clearly were within the curtilage, Redmon enjoyed a heightened expectation of privacy in the cans' contents. *See California v. Ciraolo*, 476 U.S. 207, 213, 106 S.Ct. 1809, 1812–13, 90 L.Ed.2d 210 (1986).

As Chief Judge Posner persuasively argues, the curtilage inquiry should be the determinative one in cases like this, but the majority makes scant mention of the curtilage doctrine and appears to stop short of definitively deciding whether Redmon's cans were located inside or outside his curtilage. Even if the majority is correct that "[t]he mere intonation of curtilage ... does not end the inquiry" (*ante*, Maj. Op. at 1112 (internal quotation omitted); *see also Ciraolo*, 476 U.S. at 213, 106 S.Ct. at 1812–13), it cannot ignore that the Supreme Court has considered the curtilage question to be of particular importance where the police have conducted a warrantless search on private property, for it is within the curtilage that an individual's privacy interests are "most heightened." *E.g., United States v. Dunn*, 480 U.S. 294, 300–01, 107 S.Ct. 1134, 1139–40, 94 L.Ed.2d 326 (1987); *Dow Chem. Co. v. United States*, 476 U.S. 227, 235 & 237, 106 S.Ct. 1819, 1825 & 1826, 90 L.Ed.2d 226 (1986); *Ciraolo*, 476 U.S. at 213, 106 S.Ct. at 1812–13. Under the Supreme Court's cases, then, the curtilage question must be addressed and resolved in the first instance.[1]

---

1. I cannot agree with Judge Flaum's contention that the curtilage inquiry mandated by the Supreme Court's cases essentially is irrelevant in the context of a garbage-search case. (*See ante*, Flaum, J., concurring, at 1120–1123 & 1128.) The Supreme Court took care to point out in *Greenwood* that the cans at issue there were outside the curtilage of the defendant's home. *See* 486 U.S. at 37, 108 S.Ct. at 1627; *see also* 1 Wayne R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment* § 2.6(c), at 594 (3d ed.1996). Moreover, each case in the line of circuit authority cited by Judge Flaum is easily distinguished, for in none of those cases were the defendant's garbage cans abutting his home, as Redmon's were here. Rather, the cans in each case that involved a private home were adjacent to a public street or alley, far from the home itself, thereby making the cans readily accessible to those traveling the public streets. *See United States v. Shanks*, 97 F.3d 977, 978 (7th Cir.1996), *cert. denied*, — U.S. —, 117 S.Ct. 1002, 136 L.Ed.2d 881 (1997) (cans situated on a narrow strip of land running between garage and a public alley); *Hedrick*, 922 F.2d at 397 (cans located fifty feet south of the defendant's home and twenty feet south of an unattached garage); *United States v. Kramer*, 711 F.2d 789, 792 (7th Cir.) (garbage placed at side of a road inside a knee-high fence bordering the defendant's property), *cert. denied*, 464 U.S. 962, 104 S.Ct. 397, 78 L.Ed.2d 339 (1983); *United States v. Shelby*, 573 F.2d 971, 973 (7th Cir.) (garbage adjacent to a public alley behind a small fence), *cert. denied*, 439 U.S. 841, 99 S.Ct. 132, 58 L.Ed.2d 139 (1978). As Judge Flaum himself noted in *Shanks*, that type of situation "is not significantly distinguishable from the situation presented in *Greenwood*, where the Court found that curb-side garbage was located outside the curtilage of the defendant's home." 97 F.3d at 979. Those cases thus do not support Judge Flaum's abandonment of the curtilage inquiry here.

It is possible, of course, that the majority may actually be holding, albeit obliquely, that Redmon's cans were outside his home's curtilage, for its opinion references the four factors the Supreme Court directed us to consider in resolving that question (*see Dunn*, 480 U.S. at 301, 107 S.Ct. at 1139–40) before abruptly declaring that "our decision in *Redmon* passes all the tests." (*Ante*, Maj. Op. at 1115.) Judge Evans, meanwhile, writes separately to express more explicitly his view that the cans at issue, although immediately adjacent to Redmon's home, were beyond its curtilage. (*Ante*, Evans, J., concurring, at 1128.) I have some difficulty reconciling either conclusion with the Supreme Court's view that the area immediately surrounding a private home is part of its curtilage. *See Dunn*, 480 U.S. at 300, 107 S.Ct. at 1139 (curtilage extends to the "area immediately surrounding a dwelling house"); *Ciraolo*, 476 U.S. at 212, 106 S.Ct. at 1812 (back yard immediately adjacent to a private home is within its curtilage); *Dow Chem.*, 476 U.S. at 237 n. 4, 106 S.Ct. at 1826 n. 4 ("We find it important that this is *not* an area immediately adjacent to a private home, where privacy expectations are most heightened." (emphasis in original)); *Oliver*, 466 U.S. at 180, 104 S.Ct. at 1742 ("the common law distinguished 'open fields' from the 'curtilage,' the land immediately surrounding and associated with the home"); *see also, e.g., Work v. United States*, 243 F.2d 660, 662 (D.C.Cir.1957) (trash can located under a porch in close proximity to the home was within the curtilage). In fact, those very same Supreme Court cases led this court to declare in *Hedrick* that "the yard of a residential home is within the curtilage." 922 F.2d at 399. And if the yard is within a home's curtilage, then certainly the portion of the driveway abutting the door of an attached garage is as well. (*Cf. ante*, Manion, J., dissenting, at 1133 (Redmon's curtilage "effectively paralleled his property line.").)

I find particular support for that conclusion in the Supreme Court's *Dunn* decision, where the Court was called upon to decide whether the curtilage of a home extended to the area adjacent to a separate barn located some fifty yards beyond a fence surrounding the home. 480 U.S. at 296, 107 S.Ct. at 1137. Although the Court concluded that the area at issue was beyond the home's curtilage, it did so only after rejecting the government's assertion that "the curtilage should extend no farther than the nearest fence surrounding a fenced house." *Id.* at 301 n. 4, 107 S.Ct. at 1140 n. 4 (internal quotation omitted). The Court explained:

> [T]he primary focus is whether the area in question harbors those intimate activities associated with domestic life and the privacies of the home. Application of the Government's "first fence rule" might well lead to diminished Fourth Amendment protection in those cases where a structure lying outside a home's enclosing fence was used for such domestic activities.

*Id.* Thus, although the Supreme Court has suggested that an area lying outside a home's enclosing fence may still be considered a part of its curtilage, a majority of this court apparently has concluded that the area immediately surrounding the home itself is not, and without even addressing the uses to which the homeowner actually has made of that area.[2] With respect, I submit that most urban dwellers would be shocked to learn that the portion of a driveway immediately adjacent to the garage door is considered by this court to be an "open field," rather than a part of the "area around the home to which the activity of home life extends." *Oliver*, 466 U.S. at 182 n. 12, 104 S.Ct. at 1743 n. 12. Neither the citizenry of this country nor the Supreme Court of the United States would, I believe, countenance such a conclusion.

2. In concluding that the cans here were outside the curtilage, Judge Evans similarly fails to address the uses to which Redmon may have put the area of his driveway where the garbage cans were located. Judge Evans instead muddies the issue by likening Redmon's townhouse complex to a multi-unit apartment building. (*Ante*, Evans, J., concurring, at 1128.) The comparison is not apt. Redmon lived in a townhouse, with his own garage, his own front door, his own walkway to that door, his own yard, and a driveway that he shared with just one neighbor. As our Chief Judge explains, Judge Evans' position essentially means that Redmon and other members of our society who reside in attached houses, row houses, and other urban dwellings have no curtilage at all. (*Ante*, Posner, C.J., dissenting, at 1132.)

## II.

Nor am I persuaded by the majority's attempt to liken the circumstances of this case to those in *California v. Greenwood*, 486 U.S. 35, 108 S.Ct. 1625, 100 L.Ed.2d 30 (1988), where the Supreme Court held that there is no objectively reasonable expectation of privacy in garbage left for collection at the curb of a public street. I explained in my dissent to the panel opinion that *Greenwood* does not control this case because the Court dealt there only with garbage left at curbside, outside the curtilage of the home, and did not purport to address a situation like this, where Redmon placed his closed garbage containers at a location on his driveway immediately adjacent to the door of his attached garage, far from the public street. *Redmon*, 117 F.3d at 1040–41 (Rovner, J., dissenting).

The majority rather grudgingly acknowledges that this case "is not *strictly* a curbside collection" (*ante*, Maj. Op. at 1113 (emphasis added)), but then intimates that the conclusion it reaches follows naturally from *Greenwood.* The logic goes something like this: although "not strictly a curbside collection," this case is for all practical purposes like a curbside collection in that a local ordinance prohibited Redmon from placing his cans at curbside, where the police would be entitled to search them, and required that the cans instead be stored on the property itself; Redmon's "curb," then, "was necessarily not at curbside, but on his joint walk-driveway." (*Id.* at 1114; *see also id.* at 1113 ("Redmon, in effect, chose the front of the joint garage on the shared driveway-sidewalk to be his curb for garbage pickup purposes."); *ante*, Flaum, J., concurring, at 1123 ("[O]nce Redmon left the trash for collection in his driveway, it occupied a space that … was not much different than the curbside collection point chosen in other cases.").) This is puzzling logic at best. I suppose the majority must mean that because Redmon was unable to store his garbage at a place where the police could legally search it (*i.e.,* the curb), the police were entitled to search the garbage at the place he actually stored it, despite the fact that the garbage was clearly within his property line and in fact directly next to his home. It is as if our garbage cans come equipped with an attached curb so

that they will be considered "curbside" regardless of where a municipality may require that they be stored. The majority's reasoning makes sense, of course, only if we assume that the police are entitled to one free shot at a citizen's garbage before it reaches the hands of the collector. Clearly they are not. Any entitlement the police may have to search the garbage is dependent upon its location on the defendant's property, as the location is in this circumstance the primary indicator of whether the property owner intended to relinquish his legitimate expectation of privacy. By storing his cans so close to his home—within its curtilage, I submit—Redmon indicated that he in fact did not intend to relinquish his privacy interest. And just because Redmon may have authorized a garbage collector to encroach upon his property to reach the cans does not entitle the police to do the same. *See* 1 Wayne R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment* § 2.6(c), at 595 (3d ed. 1996) ("There is no principle in Fourth Amendment jurisprudence to the effect that the police are free to do what *some* individual has been authorized to do." (emphasis in original)); *see also ante*, Posner, C.J., dissenting, at 1130. In short, there simply is no persuasive way that Redmon's case can be likened to *Greenwood;* in no sense can it be considered a "curbside collection."

## III.

I must add a word as well about the "abandonment" theory that has now crept into the majority's analysis. (*See ante*, Maj. Op. at 1113 & 1114; *see also ante*, Flaum, J., concurring, at 1125–1128.) In *United States v. Kramer*, 711 F.2d 789, 792 (7th Cir.), *cert. denied*, 464 U.S. 962, 104 S.Ct. 397, 78 L.Ed.2d 339 (1983), a panel of this court relied on an abandonment theory to hold that "the special protection the Fourth Amendment accords people in their 'persons, houses, papers, and effects' does not extend to their discarded garbage." Yet the *Kramer* panel made that observation in the context of a case like *Greenwood,* where garbage had been placed at the side of a road for removal by a private collector. *Id.* The majority intimates that the *Kramer* analysis was approved by the Supreme Court in *Greenwood*

(*ante*, Maj. Op. at 1113 & 1114), but the Court only cited Kramer amongst a laundry list of decisions that had similarly rejected Fourth Amendment challenges to garbage searches. *See* 486 U.S. at 41–42, 108 S.Ct. at 1629–30. The Court certainly did not embrace the abandonment theory articulated in *Kramer*, and the dissenting Justices in fact praised the majority for "properly reject[ing] the State's attempt to distinguish trash searches from other searches on the theory that trash is abandoned and therefore not entitled to an expectation of privacy." *Id.* at 51, 108 S.Ct. at 1634 (Brennan, J., dissenting)[3] Justice Brennan pointed out, as Chief Judge Posner does here, that "a defendant's property interest in trash does not settle the matter for Fourth Amendment purposes, for the reach of the Fourth Amendment is not determined by state property law." *Id.* (Brennan, J., dissenting) (internal quotation omitted); see ante, Posner, C.J., dissenting, at 1128 & 1130–1131.[4]

*Greenwood*'s treatment of the abandonment rationale that previously had been embraced by this court in *Kramer* and by a number of other federal and state courts led a post-*Greenwood* panel of this court to conclude that "the continued viability of an abandonment approach is questionable." *Hedrick*, 922 F.2d at 398. Today's majority retreats from that statement, but in a very equivocal way, observing that "whether the abandonment approach still remains questionable is likewise questionable." (*Ante*, Maj. Op. at 1114.) Yet the majority fails to offer any explanation for this apparent change in course. It does not, for example, cite to any post-*Greenwood* decision casting any doubt on *Hedrick*'s statement, nor does it suggest that the Supreme Court has had anything further to say on the matter. Indeed, today's majority offers not the slightest explanation as to why the *Hedrick* panel may

have been wrong. The majority instead intimates only that Redmon himself injected the abandonment issue into these proceedings by contending below that his garbage had not been abandoned, and that even if it had, that was not the proper focus of the inquiry required by *Greenwood*. (*Id.* at 1114.) But I am at a loss to understand how either of those arguments could have somehow injected what we previously considered to be an all but irrelevant factor back into the mix, particularly when Redmon himself asserted that the entire abandonment issue was not a proper consideration under *Greenwood*. After noting that Redmon had raised the issue, however, my colleagues go on to conclude that Redmon's garbage in fact had been abandoned and that "Redmon's abandonment intent should ... be considered along with other factors in making the Fourth Amendment determination." (*Id.*; *see also* Flaum, J., concurring, at 1127–28.) *Hedrick* itself explained why that is wrong:

> [That approach] is not consistent with Supreme Court protection of the curtilage and with its opinion in *Greenwood*. For instance, the Supreme Court continues to discuss the protection accorded the curtilage even though it has rejected the notion that property law defines the contours of Fourth Amendment protection. A determination, however, that garbage placed in cans for ultimate collection is unprotected by the Fourth Amendment would allow police officers to inspect cans placed next to the garage or the house itself without any showing of probable cause or any warrant, and without regard to the accessibility of the cans to the public as a whole. This result would be inconsistent with the purpose of the Fourth Amendment to protect the home and the area surrounding it from arbitrary searches. Moreover, such a holding would be inconsistent with the

---

**3.** The *Greenwood* majority did not disavow that it had done so. Indeed, I would have expected the majority's rationale in *Greenwood* to have been much different had the Court simply found the property to be abandoned. *See* LaFave, § 2.6(c), at 595.

**4.** *See also* LaFave, § 2.6(c), at 591–92 ("A justified expectation of privacy may exist as to items which have been abandoned in the property law sense, just as it is true that no such expectation

may exist on some occasions even though the property has not been abandoned. This is because under *Katz [v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967),] the question is not whether there has been abandonment in the property law sense, ... but rather whether there has been abandonment of a reasonable expectation of privacy as to the area searched or the property seized." (internal quotation omitted)).

language in *Greenwood* [itself]. The *Greenwood* Court did not base its decision solely upon the conveyance of the garbage to the collector. This was true even though the garbage collectors ·in that case actually collected the respondents' garbage at the usual time, and then conveyed it to the police. Finally, the Court has never held that the intent to convey an object or conversation to a third party renders any expectations of privacy unreasonable simply because the third party could then convey the object or information to the police.

922 F.2d at 399–400; *see also id.* at 401 (Cudahy, J., dissenting) ("the rationale that explains ·the absence of an expectation of privacy at the curbside is not that the· garbage is soon to be picked up but simply that it is *near the road.*" (emphasis in original)); LaFave, § 2.6(c), at 593 ("the mere fact that a citizen elects to dispose of his garbage in the customary way by making it available for pickup by a municipal or privately-retained hauler is no basis for concluding that his expectation of privacy as to that garbage. is unjustified"). As *Hedrick* recognized, the relevant question under *Greenwood* is not whether Redmon intended to convey his garbage to a third party, but rather whether "the garbage was readily accessible to the public so as to render any expectation of privacy objectively unreasonable." *Hedrick,* 922 F.2d at 400. As I explained in my dissent to the panel opinion, Redmon's garbage cans, located immediately adjacent to the door of a garage leading directly into his home and almost thirty feet from a public street, were not so accessible. *See Redmon,* 117 F.3d at 1042–44 (Rovner, J., dissenting).

### IV.

Although the Fourth Amendment issue raised in this appeal was deemed significant enough to warrant the full court's consideration, the majority does not attempt to fashion any guiding legal principle to focus the inquiry in future cases. In contrast to Chief Judge Posner, who persuasively advocates a bright-line curtilage rule, the majority adopts a more nebulous balancing approach, mentioning various factors without providing any legal framework under which to consider them. Indeed, the principle that emerges most strongly from the majority opinion is one that it specifically disclaims—that garbage placed outside the home for collection by a third party receives no Fourth Amendment protection at all. Despite all of its signals to that effect, the majority tells us that today's decision does not mean "that anybody's garbage cans placed on the driveway adjacent to his or her garage, regardless of the other facts and circumstances, can henceforth be searched without a warrant." (*Ante,* Maj. Op. at 1111.) My colleagues no doubt intended this statement to provide some comfort to the citizens of this circuit who will be affected by their decision, but I fear that the statement will only add to the reigning confusion, for the majority fails to articulate what considerations may cause it to reach a different conclusion in a subsequent case. Although the police and ordinary citizens are therefore left to guess, I suppose they must be content with the assurance that the members of this court will know unconstitutional police work when they see it. (*Cf. ante,* Maj. Op. at 1113 ("Not all good police work is unconstitutional.").) Yet as the Supreme Court explained in *New York v. Belton,* 453 U.S. 454, 459–60, 101 S.Ct. 2860, 2864, 69 L.Ed.2d 768 (1981), "[w]hen a person cannot know how a court will apply a settled principle to a recurring factual situation, that person cannot know the scope of his constitutional protection, nor can a policeman know the scope of his authority." *See also Oliver,* 466 U.S. at .181–82, 104 S.Ct. at 1742–43 ("This Court repeatedly has acknowledged the difficulties created for courts, police, and citizens by an ad hoc, case-by-case definition of Fourth Amendment standards to be applied in differing factual circumstances. The ad hoc approach not only makes it difficult for the policeman to discern the scope of his authority, it also creates a danger that constitutional rights will be arbitrarily and inequitably enforced." (citations omitted)).

Despite their various disclaimers, it is clear that my colleagues' decision today will have broad-ranging implications. From this day forward, the subjective expectation of privacy we all have enjoyed in the yards and driveways surrounding our homes will no longer be considered objectively reasonable.

Essentially, then, any privacy interest we had in those areas has been forever lost. That is the cost we must all bear today from the majority's insistence on sustaining a single drug conviction.

I respectfully dissent.